IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:05CR3085 |
| | ) | |
| v. | ) | |
| | ) | |
| FELIPE DEJESUS GALLARDO, | ) | REPORT, RECOMMENDATION |
| | ) | AND ORDER |
| Defendant. | ) | |
| | ) | |

The defendant has moved to suppress all evidence gathered during the search of his vehicle on July 2, 2005.  Filing 24. The defendant claims he was illegally detained following the conclusion of a traffic stop, and that his vehicle was searched without first obtaining his valid consent and in the absence of sufficient probable cause to justify the warrantless search.

The defendant has also moved to suppress any and all statements made in response to custodial interrogation because he was not properly advised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), did not effectively waive those rights, and the questioning violated the Fifth Amendment.  Filing 25.

The government filed no brief in response to either of the defendant's motions.  For the following reasons, I shall recommend that the defendant's motions be denied.

STATEMENT OF FACTS

On July 2, 2005 Nebraska State Patrol ("NSP") Trooper Greg Goltz conducted an enforcement operation at the Giltner

interchange of Interstate 80 in Hamilton County, Nebraska. Trooper Goltz has been an NSP trooper for over seventeen years and has received extensive drug interdiction and investigation training.  See ex. 7.  He has been patrolling the area that includes Interstate 80 in Hamilton County, Nebraska for over seven years.

The Giltner interchange (exit 328) consists of four ramps providing access to and egress from the interstate.  The eastbound and westbound interstate exit ramps access Highway 41B, which is a two-lane north/south roadway that crosses over the interstate and connects with Highway 34 three to four miles north of the interstate, and with the town of Giltner approximately three miles south of the interstate.  There is a stop sign located at the junction of the eastbound interstate exit ramp and Highway 41B.  See ex. 6.

The area of Interstate 80 near the Giltner interchange is straight and generally flat.  There is a small rise in the eastbound lane near the exit, but from the perspective of an eastbound motorist, this change in elevation does not block the view of vehicles traveling on the interstate.  However, eastbound motorists approaching the Giltner interchange cannot see any businesses or buildings located near this exit until they drive onto the exit ramp.  From that vantage point, the farmstead located about one-sixteenth of a mile south of the exit is visible and, if they turn north on Highway 41B and cross the interstate overpass, motorists are able to see the farmstead located about one-sixteenth of a mile north of the interstate.

The Giltner interchange is located approximately sixteen miles east of the primary exit for Grand Island, Nebraska, that

2

being exit 312.  There are several businesses, including
restaurants and fuel services, located at exit 312.  In contrast,
there are no restaurants, rest stops, or businesses at the
Giltner interchange and, for those approaching the interchange
from the west, there are no service signs or advertisements
indicating that a restaurant or other business can be accessed by
exiting the interstate at the Gilter interchange.  The only sign
for eastbound interstate traffic approaching that interchange is
a green highway sign identifying the Giltner exit.

On July 2, 2005 Trooper Goltz posted six signs west of the
Giltner interchange to warn eastbound interstate drivers that
they were approaching a state patrol checkpoint.  The first sign
was placed on the shoulder of the eastbound lane about one-
quarter to one-half mile west of the exit.  This sign stated,
"Drug Dog Ahead."  The remaining five signs were placed east of
this first sign, a few hundred yards apart and in staggered
positions, as follows:  sign two was placed in the median and
stated, "State Patrol Checkpoint Ahead;" sign three was placed on
the shoulder and stated, "State Patrol Vehicle Check Ahead;" sign
four was placed at a median crossover and stated, "Drug Dog in
Use Ahead;" and signs five and six were placed nearly across from
each other, one on the shoulder and one in the median, and very
near the Giltner exit ramp, with sign five stating, "State Patrol
Checkpoint Ahead, and sign six stating, "State Patrol Vehicle
Check Ahead."  See ex. 6.

The posting of these signs was a ruse--there was no
checkpoint.  Trooper Goltz had used the checkpoint ruse at this
location over the past two years to lure drivers conducting
illegal activity off the interstate.  However, he did not stop
every vehicle that exited the interstate at the Giltner

3

interchange and initiated a traffic stop only when he witnessed a traffic violation.

On July 2, 2005 at approximately 11:00 a.m., the defendant was traveling eastbound on Interstate 80 in a copper-colored 2004 Nissan Titan pickup. The defendant did not notice the six ruse checkpoint signs; he could not read these signs because he cannot read English. The defendant did, however, exit the interstate at the Giltner interchange.

As the defendant was exiting the interstate, Trooper Goltz was completing the traffic stop of a semi truck. The semi truck was stopped on the shoulder of the exit ramp directly behind the trooper's patrol vehicle. When the defendant's vehicle passed Trooper Goltz on the exit ramp, the trooper noticed that the pickup had no rear license plate. The trooper entered his patrol vehicle and started to follow the defendant.

The defendant proceeded to the stop sign for Highway 41B, stopped, and turned right. He drove to the farmstead located south of the interstate, turned around in the farm's driveway without contacting anyone at this location, returned north toward the interstate, and turned right onto the eastbound entrance ramp to reenter Interstate 80. By the time Trooper Goltz had driven to the top of the exit ramp, the defendant was already returning north from the farmstead toward the interstate. Trooper Goltz again observed the defendant's vehicle and noticed it had no front license plate and no visible in-transit stickers. Trooper Goltz waited at the top of the exit ramp until the defendant reached the overpass, and when the defendant turned right onto the Interstate 80 entrance ramp, the trooper followed the defendant, activated his lights, and initiated a traffic stop.

4

The defendant's vehicle stopped on the shoulder of the eastbound
entrance ramp about fifteen to twenty feet from entering
Interstate 80.

The trooper's act of activating the overhead lights in turn
activated the patrol vehicle's in-car camera.  The videotapes
received as exhibits 1 and 2 provide a true and accurate visual
and audio record of the events recorded by the in-car camera, as
supplemented by the sound captured from the officer's body
microphone.[1]  Exhibit 3 is a translated transcript of the audio
portion of the exhibits 1 and 2 videotapes.  The times set forth
in this report and recommendation are based on the exhibit 1
videotape.  Defendant's vehicle was stopped at approximately
11:18 a.m.

Trooper Goltz exited his patrol vehicle and approached the
defendant's vehicle.  As he did so, he noticed the pickup had a
darkly tinted rear window and five or six small, weathered
(dimpled and faded) boxes in the pickup bed.  Trooper Goltz asked
the defendant to produce his drivers license and vehicle
registration and advised the defendant that he was being stopped
for having no license plates.  The defendant stated he knew he
had no plates.  Trooper Goltz asked him how long he had owned the
vehicle, and the defendant responded a "long time."  Ex. 3 at p.
2.

In response to the trooper's request, the defendant produced
a Nebraska drivers license, (ex. 12), and a California
identification card, (ex. 11).  The Nebraska drivers license was
issued in October 2002; the California identification card was

---

[1]As relevant to this case, Exhibit 2 is the same as exhibit
1 except that the sound on Exhibit 2 is somewhat clearer.

issued on March 2, 2005.  The defendant also produced several
automotive repair invoices from Empire Nissan, Inc. of Ontario,
California and a Coast National Insurance Company declaration
page identifying three insured vehicles owned or operated by the
defendant, including the 2004 Nissan Titan pickup he was driving
on July 2, 2005.  See exs. 19-23.  While standing by the
passenger side of the vehicle, Trooper Goltz also saw a small
"Used Vehicle Dealer Notice/Temporary Identification" with an
Empire Nissan logo posted near the top of the passenger side
front window by the visor which indicated the vehicle was
purchased by the defendant on December 2, 2004.  See ex. 15.

Trooper Goltz asked the defendant to be seated in the
trooper's patrol vehicle.  The defendant complied.  Trooper Goltz
began reviewing the documents provided by the defendant and noted
the very high and rapid increase in mileage for this vehicle.
Based on the Empire Nissan repair invoices, the vehicle had 551
miles as of December 3, 2004 (ex. 20); 5070 miles as of January
24, 2005 (ex. 21); 9285 miles as of March 2, 2005 (ex. 22); and
29,970 miles as of May 25, 2005 (ex. 23).  Though Trooper Goltz
was beginning to suspect the defendant was using the vehicle to
transport illegal drugs, he did not call for a canine because no
nearby drug dog was on duty during the day shift that day.

Trooper Goltz asked the defendant about the vehicle, when it
was purchased, and why it had no license plates.  The defendant
responded that the vehicle was purchased in California in October
2004, and further stated he knew the vehicle had no license
plates, but the dealership had told him that if he was stopped,
the officer should contact the dealership to verify that the
defendant had purchased the vehicle.

6

Trooper Goltz further asked the defendant where he lived and what he did for a living.  The defendant responded that he and his wife lived in Fontana, California, where he was employed as a carpet and tile installer.  Trooper Goltz asked the defendant why he had a Nebraska drivers license when he lived in California.  The defendant stated he was planning to move to Sioux City, where he had lived two years earlier.

At 11:23 a.m. the trooper contacted dispatch to check the defendant's criminal history, determine if his Nebraska driver's license was valid, and determine if the vehicle was registered or reported stolen.  Since no vehicle registration was provided, Trooper Goltz provided dispatch with the vehicle's VIN number. Trooper Goltz also asked dispatch to perform a search for information from the El Paso Intelligence Center ("EPIC").  EPIC provides a central and accessible database of intelligence information originating from several law enforcement agencies. The information available through EPIC is not limited to vehicle registration information, or criminal history and outstanding warrant information, but includes intelligence information such as when persons or vehicles crossed the border into the United States.

Dispatch responded at 11:25 a.m. and reported that the defendant's Nebraska drivers license was valid and that the defendant also had a valid California drivers license.  The trooper asked the defendant where his California drivers license was located, and the defendant responded that his California license was in Sioux City.

Dispatch provided further reported that the defendant had no criminal history, and that the pickup was purchased in June 2005

7

with 461 miles.    Trooper Goltz asked the defendant about the
vehicle's current mileage and how many miles were on the vehicle
when he bought it, and commented that mileage discrepancies
existed in the Empire Nissan invoices and that the most recent
Nissan Empire invoice stated the vehicle had 29,000 miles.   The
defendant stated the vehicle had less than 60,000 miles, and he
did not know the mileage at the time of purchase.   Trooper Goltz
went to the pickup to check its current odometer reading and
discovered the vehicle had over 39,000 miles.

Upon returning to the patrol vehicle, Trooper Goltz asked
the defendant to explain how he put so many miles on the pickup
in such a short period of time.   The defendant responded that he
used the vehicle in his carpet and tile business in southern
California.

Trooper Goltz asked the defendant about the destination and
purpose of his trip.   The defendant responded that he was going
to Sioux City, Iowa for a few days to look for an apartment or
trailer, and that he may move to Sioux City.   He stated he had
lived in South Sioux City before with a friend, during the
October 2002 time frame when he acquired his Nebraska drivers
license, and that the address on his Nebraska licence was his
former address where his friend still lives.   When Trooper Goltz
asked the defendant why he exited the interstate at the Giltner
interchange, the defendant stated he was looking for gas and
something to eat.

Trooper Goltz advised the defendant that he was receiving a
citation for having no valid license plates.   The trooper had
begun to write the citation, (see ex. 9), when he received
another call from dispatch.   Dispatch told the trooper on his

cell phone that the pickup was actually registered in California in June of 2005, though the defendant had not yet received his California license plates.  Dispatch further advised that the defendant's California address (15575 Ceres Avenue, Fontana, California) was reportedly linked to a 2002 drug conspiracy arrest involving very large quantities of methamphetamine.

Once the call from dispatch was concluded, Trooper Goltz returned to questioning the defendant.  He asked the defendant to explain how long he and his wife had lived at his California residence.  The defendant stated he had lived there for a year and one half, and his wife had always lived there.  The trooper again asked the defendant about the vehicle's mileage at the time of purchase and how the defendant was able to put nearly 40,000 miles on the vehicle in the short time he owned it.  The defendant said he did not know the mileage at the time of purchase, ultimately stated "maybe a thousand," (ex. 3 at 9), and explained that he used the vehicle a lot.

Based on the information developed during the traffic stop, Trooper Goltz suspected the defendant was transporting illegal drugs.  Specifically, Trooper Goltz noted that Sioux City, Iowa is a very large Midwest distribution center for illegal drugs arriving from Arizona and California; the route driven by the defendant is a known drug transportation route; the mileage on the defendant's vehicle was very high and rose rapidly in a short period of time, which was more consistent with transporting drugs cross-country than hauling carpet or tile for a local business; the defendant exited the interstate for no credible reason at a location where signs warned of a state patrol checkpoint; the EPIC information indicated that the defendant's current California residence, which was his wife's longtime residence,

was associated with a very large methamphetamine conspiracy; the weathered items in the pickup bed looked like props; and the defendant was vague and inconsistent about his reason for traveling to Sioux City and his intended plans to move there.

At approximately 11:43 a.m., Trooper Goltz returned the defendant's papers to him, advised him of his California license plate number, handed him a violation card for having no license plate, (ex. 8) and explained that he defendant was not receiving a ticket because vehicle plates had been issued.  The trooper explained that once those license plates were on the vehicle, the defendant needed to show the pickup to a police officer, have the officer sign the violation card, and then place a stamp on the signed card and put it in the mail.  The defendant opened the passenger-side door and began exiting the vehicle.  Before the defendant was out of the vehicle, Trooper Goltz said, "Do you have a minute?"  The defendant responded, "Okay," and sat back down in the passenger seat.

 The preceding described conversations with the defendant were almost entirely in English.  Trooper Goltz speaks limited Spanish; he attended an entry-level one-semester college class in Spanish several years ago, and the remainder of his Spanish-speaking ability is derived from his on-the-job contacts with Spanish-speaking people.  The defendant speaks primarily Spanish, but he was able to communicate with the officer during the course of this traffic stop.  With some additional effort by both parties on occasion, the defendant was able to appropriately respond to officer's English-spoken questions by either answering in English or complying with the officer's request or directions.

Trooper Goltz then had the following conversation with the defendant in Spanish (interpreted below in English, exhibit 3):

| | |
|---|---|
| Trooper: | Police police to work to locate guns and lots of drugs money and ah drugs.  Any do you have any cocaine in the car? |
| Gallardo: | Nothing. |
| Trooper: | Do you have any ah marijuana inside the car? |
| Gallardo: | Nothing. |
| Trooper: | Do you have any ah methamphetamine inside the car? |
| Gallardo: | No.  Nothing. |
| Trooper: | Do you have any ah . . |
| Gallardo: | Pistols, nothing. |
| Trooper: | Pistols in the car? |
| Gallardo: | No, nothing. |

Trooper Goltz then said, "Yo yo policia yo policia buscar el carro?"  The word "buscar" is the word for "search" used in NSP's Spanish Consent to Search form.  As set forth in the exhibit 3 translation of this statement, the phrase means "I I police I police look the car?"  Spanish/English dictionaries define "buscar" as "to look" or "to seek," (The Oxford Spanish Dictionary, Spanish-English/English-Spanish 106 (2d ed. 1998)), and "to search (or look for), seek." [2]  The American Heritage

---

[2] The court may take judicial notice of the meaning of words as set forth in standard works such as dictionaries.  New York Life Ins. Co. v. Calhoun, 97 F.2d 896, 898 (8th Cir. 1938).  See also Comerica Bank v. Lexington Ins. Co., 3 F.3d 939 (6th Cir. 1993); B.V.D. Licensing Corp. v. Body Action Design, Inc., 846 F.2d 727, 728 (D.C. Cir. 1988).

<u>Spanish Dictionary:  Spanish/English, Ingles/Español</u>,
<u>http://education.yahoo.com/reference/dict_en_es/</u>, (Houghton
Mifflin Co. 2001).

        In response to the trooper's question, and without any
hesitation, the defendant responded:

        Gallardo:       (In English) OK, go ahead.

        Trooper:        Any problem?

        Gallardo:       No problem at all.

        Trooper:        You ah understand?

        Gallardo:       Yes.

        Trooper:        No problem?

        Gallardo:       No problem.

        Trooper:        Ok Thank you.  Thanks a lot.  If you just sit
                        here ("sit here" was mispronounced as
                        "seven").

        Gallardo:       Okay.

        Trooper:        (In Spanish) One moment.  (In English) If you
                        want to just shut the door.

Ex. 3 at p. 11.[3]

        After handing the defendant his papers, and before asking
him additional questions, Trooper Goltz never told the defendant
he was free to leave, and never stated that the defendant could
refuse to answer the officer's questions.  Although Trooper Goltz
likely had a Spanish Consent to Search Form in his patrol

---

        [3]With the exception of the defendant' statement, "OK, go
ahead," the remainder of the questions and responses in this
paragraph were stated in Spanish.

vehicle, he did not present it to the defendant.  However, as to
all questioning after the conclusion of the traffic stop,
including the question "Do you have a minute?", Trooper Goltz'
tone was professional, cordial, and neither intimidating nor
demanding.

The defendant closed the patrol vehicle door and remained
seated while Trooper Goltz, assisted by Trooper Allen who had
arrived at the scene, searched his vehicle.  From the defendant's
position in the passenger seat, he could readily see the officers
searching the pickup bed, the interior of the cab, and crawling
under the pickup to view its undercarriage.  As the search
continued, the defendant did not exit the vehicle, or attempt to
stop the search by gesturing or stating that he objected to the
search or that his consent was withdrawn.

Within three to five minutes, Trooper Goltz discovered what
appeared to be an after-market modification of the firewall in
the engine compartment.  It appeared Bondo® had been used to
enclose the hollow firewall and thereby create a concealed
compartment.  The Bondo® had been rough-sanded and freshly
painted with copper paint.  An examination of the fender revealed
that the newly created compartment was likely accessible by
removing the fender; the bolt used to secure the fender had been
sheered off and the head of the bolt was welded into place to
appear as if it was still holding on the fender.  Based on his
past experience in uncovering concealed compartments in vehicles,
Trooper Goltz believed removal of the fender was controlled by an
electric switch located inside the pickup, as he knew such
mechanisms are used by drug dealers to keep drivers from stealing
the cargo during transport.

13

The defendant was arrested at approximately 11:56 a.m. and advised in Spanish that there was a problem with his pickup. Trooper Goltz transported the defendant to NSP's Grand Island location.  Since searching the concealed compartment required removing the fender, and dismantling the vehicle on the interstate to perform that task presented a safety concern, Trooper Allen drove the pickup to the NSP Grand Island office.

The vehicle search was resumed in Grand Island, and during this search, the officers discovered that removal of the fender was controlled by an electronic trunk lock, and that the wires and relays for this mechanism were located in the vehicle's glove box.  The fender was ultimately removed, and cocaine was found in three compartments within the hollow cavity of the firewall.

At approximately 2:25 p.m., the defendant was seated in an NSP interview room with Trooper Goltz and NSP Investigator Coby Harrow.  See exs. 4 (interview videotape) and 5 (transcript of ex. 4) at p. 1-2.  The defendant remained handcuffed while in the interview room.[4]

The first five minutes of communicating with the defendant in the interview room focused on advising the defendant of his <u>Miranda</u> rights, and determining whether he understood those rights and was willing to waive them.  As the following explains, due to a language barrier, the defendant was advised of his

---

[4]Testimony was not offered regarding interviewing the defendant at the Grand Island NSP headquarters.  The Exhibit 4 videotape, exhibit 5 transcript, and exhibit 13 Spanish Advise of Rights form are the only evidence submitted on defendant's motion to suppress his statements allegedly obtained in violation of the Fifth Amendment.

rights but did not waive those <u>Miranda</u> rights while communicating with Trooper Goltz.

The defendant read NSP's Spanish Advice of Rights form aloud.  After each right was read, Trooper Goltz asked the defendant, in Spanish, if he understood.  For each right, the defendant acknowledged that he understood and wrote "Comprende" next to it.  See ex. 13.

Before the defendant read the waiver aloud, Trooper Goltz, in broken Spanish, advised the defendant that he facing "many problems" related to the cocaine in his vehicle, and reminded the defendant that the police are trying to stop the transport of drugs from Mexico to California, and then on to Sioux City.  He advised the defendant that the police needed his cooperation, and stated that he needed to know if the defendant was willing to cooperate with the police.  The tone of this brief discussion was forthright and informative, not coercive or accusatory.  Trooper Goltz then instructed the defendant to read the waiver of rights on the Spanish Advice of Rights form.  The defendant read it aloud, appeared confused and reluctant to sign, and did not sign the form.  Trooper Goltz did not ask him to sign it.

Attempting to speak Spanish, Trooper Goltz said he knew this was very hard for the defendant to do, but the officer wanted the defendant to know that he could assist the police and the police needed his help.  Trooper Goltz advised the defendant that the decision of whether to cooperate was the defendant's.  The defendant responded, in English, "N-no because I don't know where I have to go, I don't know."  Apparently recognizing that a language barrier remained, Trooper Goltz then advised the defendant that the trooper was going to speak English and asked

15

the defendant to state whether he understood.  Using primarily
English, Trooper Goltz explained, in basic terms, the process of
conducting a controlled delivery in Sioux City and his goal of
arresting the defendant's friends there.  Trooper Goltz asked the
defendant if he understood and if he had any questions, further
reminding the defendant that "You don't have to say 'I want I
wanna talk.'  Are you confused about what you want. . . ask me a
question."  Ex. 5 at p. 40.

    The defendant remained confused.  He re-read the <u>Miranda</u>
waiver and soon thereafter stated, "I can't understand what I
need to do."  Trooper Goltz attempted to remind the defendant, in
very basic terms, that the officers could not question him unless
he agreed to speak with them and was willing to waive his right
to an attorney.  Trooper Goltz further told the defendant that if
he invoked his right to counsel, the investigation that day would
not go forward.  Trooper Goltz asked the defendant to state, one
way or the other, whether he was willing to speak with the
officers without an attorney.  The defendant did not do so.

    Meanwhile, Investigator Harrow had left the room in search
of a Spanish-speaking officer.  He advised Trooper Goltz that a
Spanish-speaking ICE agent had been located and could assist.
When Trooper Goltz told the defendant that a Spanish-speaking
officer was en route, the defendant responded, "Ah, bueno,"
meaning "Ah, good."

    In the ICE agent's presence, the defendant re-read the
waiver of rights aloud.  The ICE agent advised the defendant, in
Spanish, that if he wanted to answer questions and was willing to
do so without an attorney present, he needed to sign the form.
He also stated that the questioning officers could not promise

the defendant anything with respect to the defendant's sentence because that decision was up to the government's attorney and the judge.  The defendant asked, "by signing here I don't have the right to get myself an attorney anymore or anything right?"  The ICE agent stated, "you want to sign . . . that you are going to answer our questions."  The defendant responded, "Ah, yes I am going to answer questions."  The ICE agent clarified, "Without attorney."  The defendant responded, "Without attorney."  Ex. 5 at 12.  The ICE agent further clarified and reminded the defendant that "if . . . we are doing questions and you don't want to answer anymore without an attorney then you say "listen I don't want to answer more. . . ."  The defendant responded, "That was my question.  So I sign."  Ex. 5 at 12.  The defendant asked where he should sign the Advice of Rights form, the ICE agent responded, and the defendant signed the <u>Miranda</u> waiver.  See ex. 13.  The defendant was not questioned by any officer after his arrest and before he signed the waiver of rights.

Throughout the course of events on July 2, 2005, the defendant did not appear under the influence of drugs or alcohol or otherwise impaired.  He was fifty-five years old at the time fo the stop.  See ex. 12.  The defendant testified that he was born in Mexico, went to school in Mexico until he completed the sixth grade, and did not attend school thereafter; came to the United States in 1974, and has been legally present since 1983; since entering the United States, he has primarily lived in southern California and worked in carpentry; and he speaks Spanish with his family and in his employment.

17

LEGAL ANALYSIS

The defendant does not argue that the traffic stop was
invalid, and does not challenge the officer's questioning or his
detention prior to being handed a violation card.  See filing 31
at p. 4.  He claims, however, that once the trooper had returned
the defendant's papers, the initial traffic stop and
investigative detention were over, and the detention thereafter
violated his Fourth Amendment rights.

Once the defendant had received his driver's license,
papers, and the violation card, he was free to leave.  As the
defendant concedes, the fact that the defendant began to exit the
patrol vehicle, with no verbal prompting by the officer,
indicates the defendant understood he was free to go.  The
defendant claims, however, a reasonable person in his position
would not have felt he was free to leave once the trooper,
immediately after the defendant began leaving the vehicle,
stated, "Do you have a minute?"  The defendant claims he was
never told he was free to leave, and was never told he did not
have to answer any questions.  He therefore claims his continued
detention violated his rights under the Fourth Amendment and any
consent to search thereafter did not purge the taint of this
unlawful detention.

"Not every encounter between a police officer and a citizen
is an unreasonable seizure under the Fourth Amendment.  A seizure
has occurred 'only when the officer, by means of physical force
or show of authority, has in some way restrained the liberty of a
citizen.'"  United States v. Richardson, 427 F.3d 1128, 1132 (8th
Cir. 2005)(quoting Terry v. Ohio, 392 U.S. 1, 19 n. 16 (1968)).
"The test for a seizure by 'show of authority' is objective and

18

asks whether, 'in view of all the circumstances surrounding the
incident, a reasonable person would have believed that he was not
free to leave.'" United States v. Pratt, 355 F.3d 1119, 1122
(8th Cir. 2004)(quoting California v. Hodari D., 499 U.S. 621,
628 (1991)). Mere questioning by the police does not constitute
a seizure, and officers do not violate the Fourth Amendment by
merely approaching an individual and asking if he is willing
to answer some questions. Florida v. Bostick, 501 U.S. 429, 434,
(1991).

The court determines whether an encounter constitutes an
unlawful detention or seizure on a case-by-case basis. There is
no litmus test distinguishing a consensual encounter from a
seizure, and the test, such as it is, is "necessarily imprecise,
because it is designed to assess the coercive effect of police
conduct, taken as a whole, rather than to focus on particular
details of that conduct in isolation." Michigan v. Chesternut,
486 U.S. 567, 573 (1988).

> Some circumstances that inform the determination of
> whether a seizure took place include:  officers
> positioning themselves in a way that limits the
> person's freedom of movement, . . . the presence of
> several officers, the display of weapons by officers,
> physical touching, the use of language or intonation
> indicating compliance is necessary, the officer's
> retention of the person's property, or an officer's
> indication that the person is the focus of a particular
> investigation. . . .

United States v. Johnson, 326 F.3d 1018, 1021-22 (8th Cir. 2003).

Considering the totality of this traffic stop, including the
considerations set forth in Johnson, I conclude that a reasonable
person in the defendant's position would have felt free to say,
"No," and to continue on his way, in response to Trooper Goltz'

19

question, "Do you have a minute?"  The defendant had received all
his property from the trooper, and was leaving the vehicle when
the question was asked.  Trooper Goltz did not physically
position himself to stop the defendant's return to his vehicle,
nor did he state that the defendant was under investigation or
suspicion.  His tone during the entirety of the stop and during
questioning after the conclusion of the traffic stop was
professional.  He made no threats or promises, and never demanded
the defendant's cooperation.

    Though there were some communication difficulties during the
stop, Trooper Goltz and the defendant were able to reasonably
communicate in English.  The defendant argues he was never told
he could leave and refuse to answer questions, and had such
information been provided, that would certainly have weighed in
favor of finding a consensual contact.  However, the fact that
the defendant was not explicitly told he was free to leave does
not establish that his conversation with Trooper Goltz was
nonconsensual.  United States v. Santos-Garcia, 313 F.3d 1073,
1078 (8th Cir. 2002)(citing United States v. Morgan, 270 F.3d
625, 630 (8th Cir. 2001)).

    Taking into account all the circumstances of this encounter,
Trooper Goltz' conduct, tone, and language would not have
communicated to a reasonable person that he was not free to
"ignore the police presence and go about his business." Michigan
v. Chesternut, 486 U.S. 567, 569 (1988)).  See Morgan, 270 F.3d
at 630 (after warning ticket issued, and all property returned to
the driver, initiating a conversation with the driver about drug
interdiction was not an impermissible detention even though the
driver had not been told she could leave and stated she did not
subjectively feel free to leave).

20

The defendant claims he did not knowingly and voluntarily consent to a search of his vehicle.  The precise question is not whether the defendant consented subjectively to Trooper Goltz' search of the pickup, nor whether the trooper actually believed he consented, but rather whether a reasonable officer under the circumstances would believe that the defendant provided a valid consent.  United States v. Jones, 254 F.3d 692, 695 (8th Cir. 2001); United States v. Sanchez, 156 F.3d 875, 878 (8th Cir. 1998).  See also Illinois v. Rodriquez, 497 U.S. 177, 188, 110 S.Ct. 2793, 2801 (1990).  The defendant's "actual subjective state of mind at the time that he allegedly gave his consent is not determinative; our focus, rather, is on how a reasonable person could have perceived his state of mind at that time." United States v. Cedano-Medina, 366 F.3d 682, 685 (8th Cir. 2004).  The Government has the burden of proving by a preponderance of the evidence that the defendant actually consented to the search of the pickup or that a reasonable officer in Trooper Goltz' position would believe that he did. United States v. Jones, 254 F.3d at 695; United States v. Miller, 20 F.3d 926, 930 (8th Cir. 1994).

When Trooper Goltz asked about the presence of drugs or guns in the vehicle, and when he asked for consent to search, he used the defendant's primary language, Spanish.  The defendant claims a significant language barrier existed between him and Trooper Goltz; the trooper used ungrammatical Spanish when requesting consent; at best, the trooper asked for permission to only "look" at the car, not to "search" the vehicle; and he failed to use a Spanish written consent to search form.  The defendant claims the totality of these factors establish that he did not knowingly and voluntarily consent to an extensive search of his pickup.

21

As to the language used, the defendant's argument presents
the question of whether the defendant's consent was knowingly
given; that is, whether the defendant understood what the officer
was asking.  The defendant's challenge to the language and
phrasing used by Trooper Goltz in requesting consent is actually
threefold:  1) he claims the Spanish was never asked for
permission to "search" the vehicle; 2) the Spanish phrase used in
requesting consent was so ungrammatical and confusing that the
defendant's affirmative response cannot be interpreted as a
knowing consent; and 3) even if the defendant consented to the
officer "looking" at his vehicle, the "search" of the vehicle as
conducted by the trooper exceeded the scope of the defendant's
consent.

The specific question asked by Trooper Goltz in requesting
consent was "Yo yo policia yo policia buscar el carro?"  This
phrase was interpreted to mean, "I I police I police look the
car?"  In the context of consents to search, the actual meaning
of "buscar" and the correct Spanish word for "search" have been
litigated in other jurisdictions with varying results.  For
example, in United States v. Jurado-Vallejo, 238 F. Supp. 2d
1290, 1291 (D.Kan. 2003), rev'd on other grounds, 380 F.3d 1235
(10th Cir. 2004), the defendant successfully claimed his alleged
consent to a search was invalid where the officer asked, "Puedo
Registro?", which the court determined was an ungrammatical way
of asking someone to register something or asking them for
registration.  A certified interpreter with twenty-eight years of
experience had testified that "'buscar' or 'esculcar' are the
only words in the Spanish language that mean to search,"
(Jurado-Vallejo, 238 F. Supp. 2d at 1291), and accordingly, the
defendant's affirmative response to "Puedo Registro?" did not
provide consent to search the vehicle.  In United States v.

22

Perez-Llanes, 2005 WL 1138507, *1 (8th Cir. 2005)(unpublished),
the court denied a defendant's motion to suppress where a defense
witness testified that "esculcar" is the common way to say
"search" and "registrar," the word used by the officer, is
obscure.  However, a court-appointed expert testified that
"esculcar" typically means "to frisk," and although it could also
mean "to search," "registrar" is a common and acceptable Spanish
word to use when asking permission to search.  Perez-Llanes, 2005
WL 1138507, *1 (citing United States v. Rojas-Millan, 234 F.3d
464, 470 (9th Cir.2000)(holding consent voluntary where, in the
context used in a written consent form, "registren" meant "to
search").

     As applied to this case, Trooper Goltz used the word
"buscar" for "search" because it is the word for "search" used in
NSP's Spanish Consent to Search form.  "Buscar" has been
described to mean "search" in some court opinions, and
dictionaries define the Spanish word, "buscar," as meaning "to
look," "to seek," or "to search."  I therefore conclude that in
the context of this traffic stop, a reasonable officer in Trooper
Goltz' position would believe that using the word "buscar" when
requesting consent conveyed that the officer wanted to "search"
the defendant's vehicle.  The trooper's use of the word "buscar,"
in and of itself, does not provide a basis for finding the
defendant did not consent to a search of his pickup.

     Based on the translation of record, in attempting to ask for
consent to search in Spanish, Trooper Goltz actually asked the
defendant, "I I police I police look the car?"  The defendant
immediately responded, in English, "OK, go ahead."  Ex. 3 at 11.
The defendant claims the officer's Spanish phrasing was

ungrammatical and nonsensical, and defendant's response to this question cannot be considered a consent to search.

A similar argument was raised under similar facts in <u>United States v. Flores-Ocampo</u>, 2005 WL 466209, *10 (D.Kan. 2005).  In <u>Flores-Ocampo</u>, the defendant, who spoke primarily Spanish, was stopped for a traffic violation.  Although the officer used a few Spanish phrases, the conversation between the defendant and officer during the stop was primarily in English, and the defendant appeared to understand what was said.  As the traffic stop progressed, the officer developed reasonable suspicion to believe the defendant was transporting contraband.  After handing the defendant a warning ticket and advising him he was free to go, the trooper inquired as to whether he could ask additional questions, and the defendant agreed.  The trooper asked for consent to search the vehicle in English, but when the defendant looked puzzled, asked, "¿ Me buscar por drugas en su carro?"  The defendant nodded his head and said, "Okay, no problem."  The vehicle was searched, and cocaine was found in a concealed cavity.

In moving to suppress the evidence, the defendant in <u>Flores-Ocampo</u> claimed the officer's Spanish phrasing and grammar were ambiguous and confusing.  The defendant argued that the verb "buscar" is not conjugated, and to say "I look for" in Spanish, one must say "yo busco para."  He argued that adding the English word "me" in front of the unconjugated verb "buscar" added to the confusion.  The court rejected these arguments, finding that the trooper and the defendant were able to reasonably communicate, and the defendant's immediate response, "Okay, no problem," coupled with his act of affirmatively nodding his head, indicated he obviously understood the trooper's question.  "Consent is

24

valid if the facts show that defendant understood an officer's
requests sufficiently to respond to them.  While [the trooper]
may not have phrased his request to search in perfect Spanish
form, defendant understood this request sufficiently to respond
to it. Thus, the Court concludes that defendant's consent was
freely and voluntarily given."  Flores-Ocampo, 2005 WL 466209,
*10.

     Similarly, following the conclusion of a traffic stop in
United States v. Garcia, 2005 WL 2679777, *3 (D.Utah 2005), the
trooper asked the Spanish-speaking motorist if there were any
drugs in his car, specifically asking about marijuana, cocaine,
methamphetamine, and heroin.  The trooper asked, in English, "Do
you care if I look?  Do you care if I search?"  Since it was
unclear as to whether defendant understood the request, the
trooper attempted to request consent in Spanish, using the words
"buscar" and "mirar."   The English interpretation of the
trooper's phrasing was "Can I look for in your car?"  Garcia,
2005 WL 2679777, *2 n. 4.  The defendant responded, "You want to
see?" and then, "You want to see, okay."  The court noted that
the defendant knew the trooper spoke limited Spanish, did not
appear confused or express any lack of understanding about the
trooper's request made in Spanish; did not ask for clarification;
and did not express any surprise or object when the trooper began
to search the car.  Based on the expert evidence presented, the
statement, considered in context, was reasonably understood as a
request to search the vehicle.  Garcia, 2005 WL 2679777, *2 n. 4
& *7 n. 8.  Though the Spanish phrasing was ungrammatical, the
totality of the circumstances indicated that the defendant
understood the trooper was requesting consent to search.  Garcia,
2005 WL 2679777, *7.

The issue of whether the defendant truly understood Trooper
Goltz' request for consent, or whether Trooper Goltz was
reasonable in believing he did, presents a close question.  The
issue may not have arisen had the officer presented the defendant
with a Spanish Consent to Search form.  Given the defendant's
lack of English proficiency, and the trooper's lack of Spanish
proficiency, "the use of a Spanish consent form here would
certainly have been desirable. . . .  However, there is no
bright-line rule requiring the use of such forms in situations
like this."  United States v. Cedano-Medina, 366 F.3d 682, 687
(8th Cir. 2004)(citing United States v. Carrate, 122 F.3d 666,
670 (8th Cir. 1997).

        Nonetheless, considered in the context of the questions
preceding Trooper Goltz' request and the defendant's response, I
conclude the defendant understood the trooper was requesting
consent to search his vehicle.  Before asking for consent,
Trooper Goltz asked if there was "cocaine in the car," "marijuana
inside the car," "methamphetamine inside the car," and "pistols
in the car."  Ex. 3 at p. 11 (emphasis added).  Receiving a "No"
response to each of these questions, Trooper Goltz asked, in a
questioning but undemanding tone, "I I police I police look the
car?"  The defendant immediately responded, "Okay, go ahead" in
English, and in response to follow up questions, stated "no
problem at all" and "no problem" in Spanish, and confirmed he
understood what the officer was asking.  Under the totality of
these circumstances, I conclude a reasonable officer would
believe the defendant understood the officer was interested in
determining what was "in" and "inside" the vehicle, and wanted to
"look;" and the defendant's statement that he understood and to
"go ahead," "no problem at all" was a knowing consent to search
the vehicle.

The defendant argues that "buscar" means "look," not
"search," and even if the defendant consented to the trooper's
request, that consent was limited to looking at the vehicle, not
searching through it.  A similar argument was raised and rejected
in United States v. Lee, 356 F.3d 831, 835 (8th Cir. 2003).  In
Lee, the officers either asked to "look at" or "look in" the
defendant's boat.  The defendant agreed and the officers searched
the boat, locating methamphetamine in a PVC pipe in one of the
boat's internal compartments.  The defendant argued the scope of
this search was excessive because "looking at" the boat does not
extend to an internal search of the boat, but allowed only an
outer, visual inspection.  In denying the defendant's motion to
suppress, Lee noted that at the time that the request was made,
the officer was already "looking at" the boat and had no need to
ask for the defendant's consent to do that.  This fact, along
with the defendant's failure to object to the search, supported a
finding that the search conducted did not exceed the scope of
defendant's consent to "look at" the boat.  Lee, 356 F.3d at 835.
See also United States v. Coffman, 148 F.3d 952 (8th Cir.
1998)(finding that defendant's invitation to police officers to
"look" around his home indicated voluntary consent to search, and
searching under the defendant's bed and pillow did not exceed the
scope of the consent); United States v. Boucher, 909 F.2d 1170
(8th Cir. 1990)(holding that consent to "look" in his truck
granted general consent to "search" it, particularly where the
defendant responded, "I'll help you get the stuff out, if you
want."); United States v. Mendoza-Gonzalez, 318 F.3d 663, 667-8
(5th Cir. 2003)(holding that where an immigration officer
obtained consent to "look in" defendant's truck, the scope of the
consent was not exceeded when the officer opened taped-shut
cardboard boxes in the truck:  "[I]t is established law in this
Circuit, and others, that a request to "look in" a vehicle is the

27

equivalent of a request for general consent to search.")
(collecting cases); <u>United States v. West</u>, 219 F.3d 1171 (10th
Cir. 2000)(holding that request for permission to "look in the
vehicle" included trunk where the defendant did not limit the
scope of the search or object when the search exceeded what he
later claimed was a limited consent).

Likewise, I conclude Trooper Goltz' request to "look the
car" was a request for general consent to search the pickup.  The
officers' search did not exceed the scope of the defendant's
consent.

The defendant claims his consent was not voluntarily given.
The Eighth Circuit has summarized the analysis required in
determining if a defendant voluntarily consented to a
search.

> A court determines whether consent is voluntary under
> the totality of the circumstances.  The Government
> bears the burden of proving voluntary consent by a
> preponderance of the evidence and must show that the
> defendant behaved in such a manner that the officer
> reasonably believed that the search was consensual.  In
> evaluating the reasonableness of the officer's belief,
> we consider the characteristics of the person
> consenting, including the party's age, intelligence and
> education, whether he was under the influence of drugs
> or alcohol, whether he was informed of his right to
> withhold consent, and whether he was aware of rights
> afforded criminal suspects.  We also consider the
> environment in which the alleged consent took place,
> specifically (1) the length of time he was detained;
> (2) whether the police threatened, physically
> intimidated, or punished him; (3) whether the police
> made promises or misrepresentations; (4) whether he was
> in custody or under arrest when the consent was given;
> (5) whether the consent occurred in a public or a
> secluded place; and (6) whether he stood by silently as
> the search occurred.

United States v. Esquivias, 416 F.3d 696, 700 (8th Cir.
2005)(internal citations omitted).  See also United States v.
Mancias, 350 F.3d 800, 805 (8th Cir. 2003).

    Although presenting another close question, I conclude the
totality of circumstances shows--barely--that the consent
to search was "voluntary."  By the time the officer asked
for consent, the defendant had been detained for twenty-five
minutes.  The defendant was a Spanish-speaking adult who was not
under the influence of any drugs or alcohol.  However, he had
only a sixth-grade education, and had no criminal history to
suggest he was aware of the rights afforded criminal suspects.
Although I have concluded that the officer's inartfully stated
request for consent was understood by this defendant, the
language barrier created a situation where the defendant needed
to interpret the trooper's poorly worded Spanish while seated in
a patrol vehicle.  The stress this added to an already stressful
situation would likely have been avoided had the officer used the
Spanish Consent to Search form.  That form would also have
advised the defendant that he had the right to withhold consent;
a message Trooper Goltz chose not to convey.  Though Trooper
Goltz was not required to provide the defendant with a written
consent form in his primary language, or to explicitly inform him
of his right to withhold his consent, (Ohio v. Robinette, 519
U.S. 33 (1996)), given that the defendant spoke only broken
English and the trooper spoke only broken Spanish, such measures
would have been wise and certainly would have assisted the
defendant in understanding what was happening and alleviating any
perception of police domination.

    However, the defendant and Trooper Goltz were reasonably
able to communicate during the traffic stop.  Trooper Goltz never

attempted to threaten or intimidate the defendant.  He was
professional and courteous throughout the traffic stop, and
conscientiously listened and followed up with the defendant to
assure the defendant understood what the officer was saying and
that the officer understood the response.  For example, as the
traffic stop was concluded, and just prior to requesting consent,
the officer explained to the defendant that he was not receiving
a ticket, explained why, provided him with his license plate
number, and made sure the defendant understood the procedure for
returning the violation card.

Trooper Goltz did not promise or misrepresent anything to
secure the defendant's further cooperation or his consent.  He
merely asked the defendant, "Do you have a minute?" as the
defendant was leaving the car, to which the defendant immediately
responded, "Okay," while sitting back in the passenger seat.  The
defendant was not under arrest.  The traffic stop occurred on an
open highway in daylight, and although another trooper arrived
during the stop and before the search, that trooper did not
contact the defendant before the search began, and there is no
evidence the defendant even knew two troopers were at the scene.
When asked for consent, the defendant's affirmative response was
immediate and enthusiastic.  He stated he understood the request,
had "no problem" with it, and sat by silently while the search
was carried out.

Under the totality of these circumstances, I conclude the
defendant's consent to search was voluntarily given.  See e.g.
United States v. Carrate, 122 F.3d 666, 670 (8th Cir. 1997)
(holding the defendant voluntarily consented to the search where,
despite his limited ability to speak English and the trooper's
failure to use a written consent form or advise the defendant of

30

his right to refuse consent, the defendant understood and
appropriately answered the trooper's questions, had been detained
for only a short amount of time before consenting, was not
threatened or physically intimidated and no promises or
misrepresentations were made, was not under arrest when he
consented, was on a public interstate; and he stood idly by while
the troopers searched his car, never indicating that he objected
to the search.)

    I further conclude the defendant voluntarily waived his
rights under Miranda. "A waiver of the Fifth Amendment privilege
against self incrimination is valid only if it is made
voluntarily, knowingly, and intelligently." United States v.
Syslo, 303 F.3d 860, 865 (8th Cir. 2002). A waiver is "knowing
and intelligent" if it is made with full awareness of both the
nature of the right being abandoned and the consequences of
abandoning the right. A waiver is "voluntary" if it was a
product of the suspect's free and deliberate choice, and not the
product of intimidation, coercion, or deception. Thai v. Mapes,
412 F.3d 970, 977 (8th Cir. 2005). The ultimate question is
whether the defendant's will to remain silent was overborne and
his capacity for self-determination critically impaired. United
States v. Santos-Garcia, 313 F.3d 1073, 1079 (8th Cir. 2002).

    The defendant read a Spanish version of his Miranda rights
aloud and indicated that he understood each right on the Advice
of Rights form. He reviewed his rights again before ever signing
a waiver. After the defendant had read each right, Trooper Goltz
briefly explained why the officers were requesting the
defendant's cooperation, and that the defendant was facing serous
problems related to the drugs in the pickup, but further stated
the decision to cooperate was up to the defendant. The defendant

31

read the <u>Miranda</u> waiver aloud, but stated he did not understand
it and did not sign it.  In a courteous and professional manner,
Trooper Goltz continued to attempt to explain the waiver,
primarily focusing on securing an answer, one way or the other,
as to whether the defendant was waiving his rights.  The trooper
never told the defendant to waive his rights or to sign the form,
and the defendant did not state he waived his rights or sign the
waiver until he received further explanation from a Spanish-
speaking officer.

    The ICE agent was able to explain, in Spanish, that signing
the form meant the defendant was agreeing to answer questions
without an attorney.  More importantly, the ICE agent explained
that even if the defendant started answering questions without an
attorney present, he could stop answering questions at any time.
The defendant responded, "That was my question.  So I sign."
Filing 5 at 12.  The waiver was signed and questioning began.  No
interrogation occurred before the defendant signed the waiver on
the Advice of Rights form.

    Although the defendant was handcuffed while in the interview
room, it is apparent he was not intimidated by his surroundings.
He did not sign the <u>Miranda</u> waiver until he understood what it
meant, as explained to him by a Spanish-speaking officer.  The
interview occurred in mid-afternoon, and there is no evidence to
indicate the defendant was weary at that point or under the
influence of any drug or alcohol.  The officers did not promise
him anything, or threaten or coerce him to secure answers to
questions.  The officers' questions were forthright and spoken in
Spanish, and the tone of the questioning was not unreasonable.
Throughout the interview, the defendant provided several evasive
answers, choosing not to reveal with any specificity the identity

32

of the suppliers in Mexico and California, or the customer in
Sioux City.

   The record does not indicate the defendant was susceptible
to police pressure or that his will was overborne.  I find that
he knowingly, intelligently, and voluntarily waived his <u>Miranda</u>
rights, and his motion to suppress his statements should be
denied.

   For all the foregoing reasons,

   IT THEREFORE IS HEREBY RECOMMENDED to the Hon. Warren K.
Urbom, United States Senior District Judge, pursuant to 28 U.S.C.
§636(b)(1)(B), that the defendant's motions to suppress, filings
24 and 25, be denied in all respects.

   The parties are notified that a failure to object to this
recommendation in accordance with the local rules of practice may
be held to be a waiver of any right to appeal the district
judge's adoption of this recommendation.

   IT FURTHER HEREBY IS ORDERED:  Trial is set for 9:00 a.m. on
April 17, 2006 for a duration of three trial days before the
Honorable Warren K. Urbom. Jury selection will be at the
commencement of trial.

   DATED this 6th day of February, 2006.

                         BY THE COURT:

                         s/ *David L. Piester*

                         David L. Piester
                         United States Magistrate Judge

33